UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x
                                    :
NATIONAL UNION FIRE INSURANCE
CO. OF PITTSBURGH, PENNSYLVANIA,    :

                  Plaintiff,        :         **OPINION**

           - against -             :         03 Civ. 6999 (DC)

AMERICAN RE-INSURANCE CO.,         :

                  Defendant.       :

- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**     EDWARDS & ANGELL, LLP
                  Attorneys for Plaintiff
                       By:  Michael P. Thompson, Esq.
                            Scott H. Casher, Esq.
                  301 Tressler Boulevard
                  Stamford, CT  06901

                  RUBIN, FIORELLA & FRIEDMAN, LLP
                  Attorneys for Defendant
                       By:  Bruce M. Friedman, Esq.
                            Gerald A. Greenberger, Esq.
                  292 Madison Avenue, 11th Floor
                  New York, New York  10017

**CHIN, D.J.**

          In this diversity action for breach of contract, an
insurance company and a reinsurance company dispute the
applicability of the "follow the fortunes" doctrine as it relates
to the insurer's payment of certain claims made against it.
Plaintiff National Union Fire Insurance Company of Pittsburgh,
Pennsylvania ("National Union") moves for summary judgment
against defendant American Re-Insurance Company ("American Re").
For the reasons that follow, the motion is granted.

## STATEMENT OF THE CASE

## I.   The Facts

The underlying facts are fully described in a previous opinion by the Court on a motion for summary judgment filed by American Re.  See Nat'l Union Fire Ins. Co. v. Am. Re-Insurance Co., 351 F. Supp. 2d 201 (S.D.N.Y. 2005) ("National Union I"). Familiarity with that opinion is assumed, and the facts will be only briefly summarized herein.

National Union issued an insurance policy (the "Milacron Policy") to Cincinnati Milacron, Inc. ("Milacron"), an Ohio machine-manufacturing company, for a one-year period commencing April 1, 1994.  Nat'l Union I, 351 F. Supp. 2d at 203-04.  The Milacron Policy provided Milacron with coverage up to $5 million after Milacron's $5 million self-insured aggregate retention was exhausted, and contained a broad pollution exclusion clause.  Id. at 204.  Thereafter, National Union sought reinsurance of the Milacron Policy with American Re.  Id. American Re issued to National Union a reinsurance policy (the "Reinsurance Policy") that provided $4 million in coverage to National Union in excess of the first $1 million of National Union's coverage.  Id.  The Reinsurance Policy also contained a broad pollution exclusion clause.  Id.

In 1996, employees (the "Bock plaintiffs") of General Motors Corporation ("GM") filed a lawsuit (the "Bock case") against GM and Milacron, alleging that they had contracted respiratory illnesses from exposure to certain metalworking

-2-

fluids that Milacron had supplied to GM.  <u>Id.</u> at 205.  The

Milacron Policy was one of several consecutive annual liability

policies that National Union had issued to Milacron for each year

from April 1, 1988, to April 1, 1995.  (Friedman Aff. Ex. 2).  In

the 1988 and 1989 policy years, the limits of National Union's

policies were $1 million per occurrence.  (<u>Id.</u>).  Beginning in

1990, the limit was increased to $5 million per occurrence.

(<u>Id.</u>).  The only one of these policies that was reinsured was the

Milacron Policy.  (Friedman Aff. Ex. 5).  American Re provided

reinsurance for up to $4 million in excess of $1 million.  351 F.

Supp. 2d at 204.  Thus, American Re would cover National Union

for up to $4 million in payments stemming from claims of the Bock

plaintiffs allocated to the Milacron Policy, but National Union

did not have reinsurance and would not be covered for losses

allocated to any other policy year.

National Union was involved in negotiations to settle

the claims of the Bock plaintiffs.  Susan Wilson, National

Union's claims analyst for the Bock case, testified that the

plaintiffs at one point made a demand of $125 million, that a

case-evaluation panel recommended settling the claims for

substantially less, and that National Union and Milacron

ultimately decided to settle on the eve of trial:

> Q:   What steps did AIG take to assure
> the best possible negotiation of the
> settlement of the Bock claims?
>
> A:   When AIG first became aware that
> this account --  . . . I went to the meeting

at Chris Bechhold's office.[1]  We listened to
what Cincinnati Milacron had to say on their
position as to whether or not we should
settle the claim at that point.  We reviewed
all the file materials.  We reviewed all the
other information.  AIG made the
determination that we didn't have the
supporting documents to agree to the [amount
recommended by the panel] at that time.  What
we decided to do . . . was we hired a special
defense counsel that had expertise in this
area to come in and help defend this case.
Our intent was to take it to trial, to go
through all the expert discovery which had
not taken place yet, . . . to basically fight
this for everything it's worth, because based
on the information that we had early on, we
didn't believe that to be an accurate
portrayal of what this claim was worth.
However, after all those actions were taken,
sometime in late January it became apparent
that this trial date could not be continued
and that the experts did not say what we
perhaps might have thought they would say and
that for all -- all circumstances considered
and discovery that had been considered in the
case, that we should settle it for the amount
we ultimately did.

. . .

   Q:   In retrospect, could anything have
been done better than it was actually done?

   A:   Between November and February?  No.

(Wilson Dep. at 185-86, Thompson Decl. Ex. D).

The Bock case ultimately was settled for less than what
the arbitration panel had recommended.  Milacron allocated the
claims of the twenty-one Bock plaintiffs evenly between its 1993-
94 policy and the Milacron Policy (which covered April 1, 1994,

---

[1]     Bechhold was a lawyer who represented Milacron "in
connection with its efforts to obtain insurance coverage for
claims relating to metal working fluids against Milacron."
(Bechhold Dep. at 8, Thompson Decl. Ex. F).

to April 1, 1995) using a "manifestation trigger," meaning that coverage under an insurance policy is based on when the alleged personal injury first becomes known. (Wilson Dep. at 167, Thompson Decl. Ex. D; Bechhold Dep. at 35-36, 64-65, Thompson Decl. F). National Union internally questioned whether the manifestation trigger was proper and consistent with Ohio law, but ultimately decided to honor the 93-94 policy and the Milacron Policy rather than engage in the risks inherent in litigation of the claims. (Friedman Aff. Ex. 2; Dingilian Dep. at 70, Thompson Decl. Ex. G; Wilson Dep. at 186, Thompson Decl. Ex. D).

The amount that Milacron allocated to the year covered by the Milacron Policy exceeded the policy maximum, and when National Union attempted to collect from American Re as reinsurer, American Re refused payment based on the pollution exclusion clause in the Reinsurance Policy. See National Union I, 351 F. Supp. 2d at 205-06. This lawsuit followed, and in National Union I the Court held that (a) Ohio law applied to the interpretation of the pollution exclusion clauses, (b) the pollution exclusion clause in the Reinsurance Policy was ambiguous and therefore, as a matter of law, did not bar recovery by National Union, (c) the underlying facts of the Milacron lawsuit giving rise to National Union's claim did not qualify as "environmental pollution," and (d) there was arguably coverage under the Milacron Policy and American Re was therefore required to "follow the fortunes" of National Union. See id. at 205-13. American Re, therefore, was "not permitted to avoid liability by

raising policy defenses and objections that were available to the reinsured unless the reinsured pa[id] a settlement that [was] clearly or manifestly outside the scope of the reinsured's policy coverage or pa[id] a settlement that [was] fraudulent, collusive or in bad faith." Id. at 212.

At a conference after the National Union I decision was issued, the Court granted American Re six months during which to take discovery on whether the claims made against the Milacron Policy with respect to the Milacron settlement were manifestly outside the scope of the policy or whether National Union's decision to pay the claims was fraudulent, collusive, or in bad faith. National Union now moves for summary judgment, arguing that there is no evidence that the Milacron settlement was made in bad faith or otherwise outside the scope of the Milacron Policy.

**DISCUSSION**

**I.    Applicable Law**

    **A.    Reinsurance and "Follow the Fortunes"**

As explained by the Court in National Union I, "[r]einsurance is a contractual arrangement whereby one insurer (the ceding insurer) transfers all or a portion of the risk it underwrites pursuant to a policy or group of policies to another insurer (the reinsurer)." Barry R. Ostrager & Thomas R. Newman, Handbook on Ins. Coverage Disputes § 15.01[a] (12th ed. 2004) (citing Colonial Am. Life Ins. Co. v. Commissioner, 491 U.S. 244,

-6-

244 (1989)). "The scope of the risks assumed by a reinsurer depends upon the terms of the policies that are reinsured." Id. (citing Hartford Fire Ins. Co. v. California, 509 U.S. 806-07 (1993)). While the reinsurer is not required to pay for losses that are not covered under the underlying policy, "[a] reinsurer cannot second guess the good faith liability determinations made by its reinsured, or the reinsured's good faith decision to waive defenses to which it may be entitled." Id. § 15.04[b] (quoting Christiania Gen. Ins. Corp. v. Great Am. Ins. Co., 979 F.2d 268, 280 (2d Cir. 1992), cited in Int'l Surplus Lines Ins. Co. v. Certain Underwriters & Underwriting Syndicates at Lloyd's of London, 868 F. Supp. 917, 921 (S.D. Ohio 1994)).

The "follow the fortunes" doctrine obligates the reinsurer to indemnify the ceding insurer (the "cedent") for any payments the cedent makes for claims covered by the underlying insurance. Id. § 16.01[a]. "The purpose of this doctrine is to prevent the reinsurer from second-guessing the settlement decisions of the reinsured, thereby promoting good faith settlements by the reinsured." N. River Ins. Co. v. Employers Reins. Corp., 197 F. Supp. 2d 972, 978 (S.D. Ohio 2002); see also Ostrager & Newman, Handbook on Ins. Coverage Disputes at § 16.01[a] (doctrine "preclude[s] wasteful relitigation by a reinsurer of defenses to underlying policy coverage in cases where the ceding insurer has in good faith paid a settlement" ). The Second Circuit has held that the "follow the fortunes" doctrine "simply requires payment where the cedent's good-faith

-7-

payment is at least arguably within the scope of the insurance coverage that was reinsured." Mentor Ins. Co. (U.K.) v. Norges Brannkasse, 996 F.2d 506, 517 (2d Cir. 1993), cited in Int'l Surplus Lines Ins. Co., 868 F. Supp. at 920. "This standard is purposefully low" and the decision making process of the ceding insurer is not subject to de novo review. Int'l Surplus Lines Ins. Co., 868 F. Supp. at 921.

## II. **Application**

American Re does "not question[] the underlying settlement, nor the decision of . . . National Union to pay part of the underlying settlement." (American Re Opp. Br. at 1). Rather, American Re contends that it need not follow the fortunes of National Re for three reasons: First, it is not required to cover claims that were not covered by the Milacron Policy; second, National Union's allocation of some claims to the Milacron Policy was unreasonable; and third, National Union's "reckless indifference" to American Re's interests was not good faith. Each of these arguments fails as a matter of law.

As to the first point, American Re argues that there is evidence in the record to the effect that the injuries of several Bock case claimants first manifested prior to April 1, 1994, and thus fell outside the scope of the Milacron Policy. As noted above, the follow-the-fortunes doctrine requires American Re to pay National Union's claim if National Union's payment of the Milacron claim "[was] at least arguably within the scope of the insurance coverage that was reinsured." Mentor Ins. Co. (U.K.),

996 F.2d at 517 (2d Cir. 1993). In other words, American Re is required to follow the fortunes of National Union unless National Union paid a settlement that was "clearly or manifestly outside the scope of the reinsured's policy coverage." National Union I, 351 F. Supp. 2d at 212 (citation omitted). Summary judgment for National Union would therefore be appropriate if payment of the claims was even arguably within the scope of the policy it issued to Milacron. No reasonable factfinder could find that the payment was not at least arguable.

American Re makes much of the fact that documents prepared by Milacron defense counsel and produced during discovery seem to indicate that various of the Bock plaintiffs began to manifest symptoms before April 1, 1994, and that therefore any payment based on claims of these plaintiffs was outside the scope of the reinsured policy. (See American Re. Opp. Br. at 18-27). For example, one such document -- which appears to be a document intended to summarize the damages and medical history of the individual Bock plaintiffs -- indicates that one Bock plaintiff, Bobby Ray Campbell, "began to feel ill" in September 1993. (See NAT 00848; Friedman Aff. Ex. 27). Another plaintiff, Anthony Dubey, "began feeling symptoms" in late November 2003. (See NAT 00851; Friedman Aff. Ex. 27). But those very same documents arguably also support the conclusion that the plaintiffs' injuries did not "manifest" until after April 1, 1994. For example, the summary of Campbell's illnesses indicates that "Mr. Campbell received diagnoses regarding his

condition beginning in June 1994," (see NAT 00848; Friedman Aff. Ex. 27), and the summary of Dubey's illnesses is similar, indicating that he did not take sick leave until April 27, 1994, and that he received several diagnoses between April 1994 and December 1995. (See NAT 00851-52; Friedman Aff. Ex. 27). The summaries for the other plaintiffs at issue are similar.[2]

   If this case were a dispute between Milacron and National Union as to what date these plaintiffs' injuries first manifested, clearly these documents would create an issue of fact for trial. But that is not the issue. Rather, the issue is whether the payment by National Union was "at least arguably within the scope of the insurance coverage that was reinsured." Mentor Ins. Co. (U.K.), 996 F.2d at 517 (emphasis added). Based on the very documents that American Re cites in support of its position, a reasonable factfinder could only conclude that the manifestation date was at least arguable. American Re, as a reinsurer bound to follow the fortunes of the reinsured, is not entitled to a "de novo review of [National Union]'s decision-

_____

   [2]   Gary Howard's summary indicates that he "suffered injury as early as 1988," but also that he "first received a diagnosis regarding pulmonary injury in August 1994." Walter Hunter's indicates that he "first experienced symptoms" in late 1993 or early 1994, but also that he "began to receive tentative diagnoses in April 1994." Eugene Jackovich's states that he first complained of symptoms in January 1994, but that he received a tentative diagnosis in September of 1994. Stanley Johnson's indicates that he first suffered symptoms in the fall of 1993, but that he received a diagnosis in May 1994 and did not take sick leave until November 1994. Nelson Porter's states that he first began feeling symptoms in late 1993 or January 1994, but that he took sick leave beginning in June 1994 and was not diagnosed until 1995. (See Friedman Aff. Ex. 27).

making process." <u>N. River Ins. Co. v. Ace Am. Reinsurance Co.</u>,

361 F.3d 134, 140 (2d Cir. 2004) (internal quotation marks

omitted).  There is thus no issue of material fact to be tried

with respect to whether the underlying claims fell outside of the

reinsured policy.

American Re's second argument is that National Union

acted unreasonably in accepting Milacron's allocation of several

Bock case plaintiffs to the reinsured policy when it sought

reinsurance.  In other words, American Re argues that even if

National Union accepted Milacron's allocation of the claims to

the Milacron policy for purposes of paying those claims, it

should have taken it upon itself to re-allocate those same claims

internally when considering whether to seek payment from its

reinsurer.  First, this argument fails for the same reasons as

American Re's first argument -- as discussed above, the

allocations by Milacron to the Milacron policy were at least

arguably correct, and therefore National Union's acceptance of

them could not have been unreasonable.  But, in any event, this

argument must fail because it is exactly the type of inquiry that

the follow-the-fortunes doctrine is intended to prevent.  As the

Second Circuit has explained,

> To allow reinsurers to second-guess [the
> propriety of a reinsured's allocation] would
> be to make settlement impossible and
> reinsurance in itself problematic . . . .
> [W]e decline to authorize an inquiry into the
> propriety of a cedent's method of allocating
> a settlement if the settlement itself was in
> good faith, reasonable, and within the terms
> of the policies . . . . [W]ere we to
> undertake such an analysis, we would be

engaging in precisely the kind of intrusive
factual inquiry that the follow-the-fortunes
doctrine is meant to avoid.  Judicial review
of either the settlement decision or the
allocation decision has an equal likelihood
of undermining settlement and fostering
litigation.

Travelers Casualty & Surety Co. v. Gerling Global Reinsurance
Corp., 419 F.3d 181, 189 (2d Cir. 2005) (internal quotation marks
and citations omitted).  Follow-the-fortunes, then, prohibits
judicial inquiry into the propriety of a reinsured's post-
settlement allocation "if the settlement itself was in good
faith, reasonable, and within the terms of the policies."  Id.
There has been no suggestion here that the underlying settlement
was not taken in good faith or was unreasonable; indeed, American
Re explicitly states that it "is not questioning the underlying
settlement."  (American Re Opp. Br. at 1).  Furthermore, as
explained above, the settlement covered claims that were at least
arguably within the terms of the policy.  An inquiry into the
reasonableness of National Union's post-settlement allocation is
therefore inappropriate in light of Travelers Casualty.

Finally, American Re argues that summary judgment is
inappropriate because there is evidence from which a reasonable
factfinder could find that National Union acted in bad faith with
respect to American Re's interests.  Specifically, American Re
argues that National Union was "indifferen[t]" to the improper
allocation of plaintiffs to the reinsured policy, and that it
"intentionally turned a blind eye in order to maximize" its
reinsurance recovery.  (American Re. Opp. Br. at 34).  American

-12-

Re cites very little evidence in the record in support of this argument; presumably it can be inferred from the fact that the Milacron Policy was the only policy for which National Union had reinsurance, and therefore National Union had little incentive to allocate its payments under the Milacron settlement to any other policy.

"A reinsurer who seeks to avoid application of follow-the-fortunes by claiming bad faith . . . must make an <u>extraordinary</u> showing of a disingenuous or dishonest failure." <u>Travelers Casualty</u>, 419 F.3d at 191 (citation omitted). The Second Circuit further explained that

> [i]ndeed, a cedent choosing among several reasonable allocation possibilities is surely not required to choose the allocation that minimizes its reinsurance recovery to avoid a finding of bad faith . . . . An allocation that increases reinsurance recovery -- when made in the aftermath of a legitimate settlement and when chosen from multiple possible allocations -- would rarely demonstrate bad faith in and of itself.

<u>Id.</u> at 193.

Thus, even assuming that National Union was indifferent to the improper allocation of plaintiffs to the reinsured policy, it would not rise to the "extraordinary" showing of bad faith required to avoid application of the follow the fortunes doctrine. The simple fact is that National Union had no duty to American Re to minimize its reinsurance recovery.

Apart from the inference that could arguably be raised by the fact that the reinsured policy was the only policy that had been reinsured, American Re has pointed to only one other

-13-

fact that could arguably support its contention that National
Union acted unreasonably or in bad faith: National Union's
coverage counsel's apparent disagreement with Milacron's decision
to employ a manifestation trigger when allocating the claims of
the Bock case plaintiffs.  In particular, American Re points out
that National Union's coverage counsel wrote that it believed
that Milacron's decision to employ a manifestation trigger was
"improper" in light of some Ohio authority to the contrary.  (See
American Re Opp. Br. at 29-30; Friedman Aff. Ex. 2).  National
Union recognized that Milacron had a significant financial
motivation to apply a manifestation trigger, as opposed to a
continuous trigger, because it "would be responsible for a much
greater proportion of the damages if a continuous trigger were
employed."  (Id. at 30; Friedman Aff. Ex. 2).  Ultimately,
National Union chose not to quibble with Milacron's allocation
methodology -- even though it was arguably incorrect -- because
there was a risk that a different method would trigger additional
National Union policies and increase National Union's exposure.
(Id.).

American Re argues -- without citing a case in support
-- that as a reinsurer it is only required to follow National
Union's "insurance fortunes," not its "commercial fortunes," and
that National Union's "unwillingness to litigate against [its]
captive insurer or [its] reluctance to take a firm position in
this case on trigger so that National Union might be able to
argue in favor of a different trigger in a future case are not

decisions that are properly binding on a reinsurer." (American Re Opp. Br. at 31).

This argument is rejected for several reasons. First, the National Union coverage letter that American Re relies on, while expressing disagreement with Milacron's allocation trigger, explicitly recognized the issue was still an open question: the letter explained that "the Ohio Supreme Court has yet to rule definitively on the trigger of coverage to be applied in latent bodily injury cases." (Friedman Aff. Ex. 2). It also recognized that a manifestation trigger had been approved by an Ohio appellate court in a lawsuit involving a continuous property damage claim. (Id.).

Second, and more fundamentally, National Union's unwillingness to litigate the trigger issue with Milacron and reluctance to take a firm position on the trigger issue are not bases for a finding of unreasonableness or bad faith -- indeed, they are legitimate business considerations for an insurer considering whether to litigate or settle claims made against it. See N. River Ins. Co. v. ACE Am. Reinsurance Co., 361 F.3d 134, 140 (2d Cir. 2004) ("[T]he main rationale for the [follow-the-fortunes] doctrine is to foster the goals of maximum coverage and settlement and to prevent courts, through de novo review of the cedent's decision-making process, from undermining the foundation of the cedent-reinsurer relationship.") (internal quotations, citations, and alterations omitted). As the Second Circuit has explained in a case involving a reinsurer making an argument

similar to the one American Re makes here,

> ACE's appeal relies for its success . . . on
> the specific factual information on which it
> alleges North River relied in its settlement
> negotiations.  But it is precisely this kind
> of intrusive factual inquiry into the
> settlement process, and the accompanying
> litigation, that the deference prescribed by
> the follow-the-settlements doctrine is
> designed to prevent.  Requiring post-
> settlement allocation to match pre-settlement
> analyses would permit a reinsurer, and
> require the courts, to intensely scrutinize
> the specific factual information informing
> settlement negotiations, and would undermine
> the certainty that the general application of
> the doctrine to settlement decisions creates.

Id. at 241.

Like the reinsurer in North River, American Re argues that the apparent inconsistency between National Union's initial belief that Milacron's allocation decision was incorrect and its ultimate acceptance of that allocation in seeking reinsurance coverage is evidence of unreasonableness and/or bad faith.  To the contrary, the most it evidences is that National Union took various legitimate factors and risks into account when deciding whether to settle the claims made against it, an examination of which is not an appropriate undertaking under the follow-the-fortunes doctrine.

## III. **Discovery Dispute**

After I denied American Re's motion for summary judgment on January 3, 2005, I held a status conference on January 21, 2005, at which I granted American Re approximately six months to take additional discovery.  Thereafter, on March

11, 2005, and April 13, 2005, I held two additional conferences in an attempt to resolve discovery disputes. At a status conference on July 15, 2005, after the close of discovery, American Re represented that National Union had failed to produce documents responsive to American's Re's requests, and I instructed American Re in its opposition to National Union's motion for summary judgment to explain how any unproduced documents would create issues of material fact that would result in denial of the motion.

Now, American Re argues that summary judgment should be denied because National Union failed or refused to produce (1) documents related to the policies it issued to Milacron prior to 1993, (2) documents relating to its decision to raise its reserves for the Bock claims to $500,000, (3) coverage counsel opinions relating to different policies, (4) a draft complaint that National Union contemplated using to sue Milacron regarding Milacron's decision to use a manifestation trigger, and (5) deposition transcripts of the Bock plaintiffs in the underlying action. (See Greenberger Aff.). National Union, for its part, represents that it produced all non-privileged responsive documents in its possession. National Union states that it produced all documents relating to the Milacron policy and the policy covering the period from April 1, 1993, to April 1, 1994, implicitly admitting that it did not produce, as requested, documents relating to earlier policies. (See Casher Decl.). National Union apparently takes the position that producing

documents relating to other policies and unrelated claims made against those policies would be unduly burdensome. (See June 20, 2005, National Union letter, Greenberger Aff. Ex. 8).

The parties' conduct during discovery has hardly been paradigmatic. Nevertheless, American Re has failed to show that any of the documents that it claims National Union has failed to produce would create an issue of material fact that would justify denying National Union's summary judgment motion. At most, the documents American Re seeks would provide a basis to question National Union's post-settlement allocation, or provide evidence that the Bock plaintiffs' claims may have manifested before April 1, 1994. But, as explained above, an inquiry into the former is not appropriate under the follow-the-fortunes doctrine, and payment of the Bock plaintiffs' claims was at least arguably reasonable. American Re had nearly a year to conduct discovery, visited National Union's office for three days to audit and copy its files, took numerous depositions, and, curiously, already moved for summary judgment -- thereby representing that there were no material facts in dispute. The Court is not convinced that further discovery would raise issues of fact sufficient to overcome the heavy burden placed on American Re by the follow-the-fortunes doctrine. Accordingly, this is not a basis upon which to deny summary judgment.

## IV. __Pre-Judgment and Post-Judgment Interest__

National Union seeks pre- and post-judgment interest on the amount owed to it by American Re. In a diversity case,

issues regarding pre-judgment interest are governed by state law. See Mallis v. Bankers Trust Co., 717 F.2d 683, 692 n.13 (2d Cir. 1983). Because I already determined in National Union I that Ohio law governs, the award of pre-judgment interest is governed by Ohio Statute 1343.03(A), which provides that, "when money becomes due and payable upon . . . all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of . . . a contract, the creditor is entitled to interest" at a rate to be determined under the Ohio code, "unless a written contract provides a different rate." Ohio Rev. Cod. Ann. § 1343.03(A). "To make the aggrieved party whole, the party should be compensated for the lapse of time between accrual of the claim and judgment." Royal Elec. Constr. Corp. v. Ohio State Univ., 652 N.E. 2d 687, 692 (Ohio 1995). Thus, National Union is entitled to interest from July 17, 2003 (the date on which American Re refused to pay its claim), until judgment.

Furthermore, "the award of post-judgment interest is mandatory on awards in civil cases as of the date judgment is entered." Lewis v. Whelan, 99 F.3d 542, 545 (2d Cir. 1996). National Union is therefore also entitled to post-judgment interest, at any contract rate or, if there is none, at whatever rate is prescribed by Ohio law.

### CONCLUSION

National Union's motion for summary judgment is granted. National Union shall submit a proposed judgment, with an affidavit explaining the calculations, on or before August 7,

2006. American Re's objections, if any, shall be served and filed by August 14, 2006.

SO ORDERED.

Dated:    New York, New York
          July 28, 2006

DENNY CHIN
United States District Judge